AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means

❏ Original    ❏ D[...]



CLERK'S OFFICE
A TRUE COPY
Feb 23, 2024
s/ JDH
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT
for the

Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>Luz Maria Naranjo (N7253 Forest Road, Lot 20,<br>Beaver Dam, WI) and William Lee Homan (214 S.<br>Depot St., Fox Lake, WI) for Electronic Devices | )<br>)<br>)<br>)<br>)<br>)<br>) Case No. 24-M-350 (SCD) |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the          Eastern          District of          Wisconsin
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B

**YOU ARE COMMANDED** to execute this warrant on or before          3-8-24          *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.      ❏ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to          Stephen C. Dries, U.S. Magistrate Judge          .
*(United States Magistrate Judge)*

❏ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
❏ for _____ days *(not to exceed 30)*    ❏ until, the facts justifying, the later specific date of _____ .

Date and time issued:      2-23-24. 10:30 am          _____
*Judge's signature*

City and state:      Milwaukee WI          Stephen C. Dries, U.S. Magistrate Judge
*Printed name and title*

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

**Certification**

      I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## **ATTACHMENT A**

*Persons to be searched*

The person of Luz Maria NARANJO, born 11/18/1979, for the phone assigned cellular telephone call number (920) 763-2157 ("Target Device-1"), with service provided by U.S. Cellular and subscribed to by NARANJO.



The person of William Lee HOMAN, born 05/06/1977, for the phone assigned cellular telephone call number (920) 296-5040 ("Target Device-2"), with service provided by U.S. Cellular and subscribed to by HOMAN's spouse, Kimberly Homan.



*Devices to be searched*

Target Device-1.
Target Device-2.

**ATTACHMENT B**

*Evidence to be seized*

1.	All records and information on Target Device-1 and Target Device-2, described in Attachment A, that relate to violations of 18 U.S.C. § 666 (Federal Program Bribery), 18 U.S.C. § 1951(a) (Conspiracy to Obtain Property Under Color of Official Right), 18 U.S.C. §§ 1343 & 1346 (Honest Services Wire Fraud), 18 U.S.C. § 1951(a) (Obtaining Property Under Color of Official Right), 18 U.S.C. § 1952(a)(3) (The Travel Act), 21 U.S.C. § 841 (Distribution of a Controlled Substance and Possession of a Controlled Substance with Intent to Distribute), 21 U.S.C. § 843(b) (Use of a Communication Facility to Facilitate a Drug Felony), and 21 U.S.C. § 846 (Conspiracy to Distribute a Controlled Substance) and involve Luz Maria NARANJO and William Lee HOMAN since January 1, 2020, including:

(a)	All records, information, and communications relating to the logistics of smuggling in contraband to Waupun Correctional Institution ("WCI"), to include how any controlled substance was smuggled into WCI;

(b)	Records, information, and communications with current and former WCI inmates;

(c)	The finances—including but not limited to expenditures, obligations, income, and any financial or monetary transfers—of Luz Naranjo and William Homan;

(d)	Records, information, and communications relating to the sale and possession of controlled substances;

(e)	All bank records, checks, credit card bills, account information, and other financial records for any payments related to the sale, possession, or transportation of controlled substances;

(f)      Records and information relating to the identity or location of the suspects, associates, and co-conspirators;

2.      Evidence of user attribution showing who used or owned Target Device-1 and Target Device-2 at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

During the execution of the search of the person described in Attachment A, law enforcement personnel are authorized to obtain from Luz Maria NARANJO and William Lee HOMAN the compelled display of any physical biometric characteristics (such as fingerprint/thumbprint, facial characteristics, or iris display) necessary to unlock Target Device-1 and Target Device-2 requiring such biometric access subject to seizure pursuant to this warrant for which law enforcement has reasonable suspicion that the aforementioned person's physical biometric characteristics will unlock Target Device-1 and Target Device-2, to include pressing fingers or thumbs against and/or putting a face before the sensor, or any other security feature requiring biometric recognition, for the purpose of attempting to unlock Target Device-1 and Target Device-2's security features in order to search the contents as authorized by this warrant.

With respect to the search of the information provided pursuant to this warrant, law enforcement personnel will make reasonable efforts to use methods and procedures that will locate and expose those categories of files, documents, communications, or other electronically stored information that are identified with particularity in the warrant while minimizing the

review of information not within the list of items to be seized as set forth herein, to the extent

reasonably practicable. If the government identifies any seized communications that may

implicate the attorney-client privilege, law enforcement personnel will discontinue its review and

take appropriate steps to segregate all potentially privileged information so as to protect it from

substantive review. The investigative team will take no further steps regarding any review of

information so segregated absent further order of the court. The investigative team may continue

to review any information not segregated as potentially privileged.

This warrant authorizes a review of electronic storage media and electronically stored

information seized or copied pursuant to this warrant in order to locate evidence, fruits, and

instrumentalities described in this warrant. The review of this electronic data may be conducted

by any government personnel assisting in the investigation, who may include, in addition to law

enforcement officers and agents, attorneys for the government, attorney support staff, and

technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or

copied electronic data to the custody and control of attorneys for the government and their

support staff for their independent review.

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin



CLERK'S OFFICE
A TRUE COPY
Feb 23, 2024
s/ JDH

Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

In the Matter of the Search of

*(Briefly describe the property to be searched or identify the person by name and address)*

Luz Maria Naranjo (N7253 Forest Road, Lot 20, Beaver Dam, WI) and William Lee Homan (214 S. Depot St., Fox Lake, WI) for Electronic Devices

)
)
)
)
)
)
)

Case No. **24-M-350 (SCD)**

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____ Eastern _____ District of _____ Wisconsin _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 666, 1343 and 1346, 1951(a), 1952(a)(3); 21 U.S.C. §§ 841, 843(b) and 846 | Federal Program Bribery, Honest Services Wire Fraud, Conspiracy and Obtaining Property Under Color of Official Right, The Travel Act; Distribution of a Controlled Substance (and Conspiracy), Communication Facility for Drug Felony |

The application is based on these facts:

See Attached Affidavit

- ☐ Continued on the attached sheet.
- ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

FBI Special Agent Eric Burns
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____ Telephone _____ *(specify reliable electronic means)*.

Date: 2-23-24
_____

_____
*Judge's signature*

City and state: Milwaukee, Wi

Stephen C. Dries, U.S. Magistrate Judge
_____
*Printed name and title*

<u>**AFFIDAVIT IN SUPPORT OF AN APPLICATION**</u>
<u>**UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE**</u>

I, Eric Burns, being first duly sworn, hereby depose and state as follows:

<u>**INTRODUCTION AND AGENT BACKGROUND**</u>

1.      I make this affidavit in support of an application under Rule 41 of the Federal
Rules of Criminal Procedure for a search warrant authorizing the search of Luz Maria
NARANJO ("NARANJO") and William Lee HOMAN ("HOMAN"), as described in
Attachment A, for electronic devices ("Target Device-1" and "Target Device-2"), as described in
Attachments A and B. I further request that the contemplated search warrant authorize the search
of Target Device-1 and Target Device-2 for evidence more fully described in Attachment B.

2.      I am a Special Agent of the Federal Bureau of Investigation ("FBI") currently
assigned to the Milwaukee Field Office.  As such, I am an investigative or law enforcement
agent of the United States authorized under Title 18, United States Code, Section 3052, that is,
an officer of the United States who is empowered by law to conduct investigations, to make
arrests, and to collect evidence for various violations of federal law.  I have been employed as a
Special Agent of the FBI since November 2009.

3.      I am currently assigned to an FBI squad which investigates financial crimes, civil
rights crimes, and public corruption crimes.  During my tenure with the FBI, I have participated
in investigations involving the corruption of public officials, to include correctional officers and
staff. I have participated in all aspects of investigations including executing search warrants
involving, among other things, the search and seizure of computers, computer equipment,
software, and electronically stored information. Through my experience and training, I have
become familiar with activities of individuals engaged in illegal activities, to include their
techniques, methods, language, and terms. During my career, my investigations have included

the use of various surveillance techniques and the execution of numerous search and seizure warrants, including for computers and cellular telephones.

4. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, and agencies. This Affidavit is intended to show merely that there is sufficient probable cause for the requested warrant. It does not set forth all of my knowledge, or the knowledge of others, about this matter.

5. Based on my training and experience and the facts as set forth in this Affidavit, I submit there is probable cause to believe that NARANJO, HOMAN, and others have committed violations of 18 U.S.C. § 666 (Federal Program Bribery), 18 U.S.C. §§ 1343 and 1346 (Honest Services Wire Fraud), 18 U.S.C. § 1951(a) (Conspiracy to Obtain Property Under Color of Official Right), 18 U.S.C. § 1951(a) (Obtaining Property Under Color of Official Right), 18 U.S.C. § 1952(a)(3) (The Travel Act), 21 U.S.C. § 841 (Distribution of a Controlled Substance and Possession of a Controlled Substance with Intent to Distribute), 21 U.S.C. § 843(b) (Use of a Communication Facility to Facilitate a Drug Felony), and 21 U.S.C. § 846 (Conspiracy to Distribute a Controlled Substance) (the "SUBJECT OFFENSES") and that evidence and instrumentalities of such crimes is likely to be found on Target Device-1 and Target Device-2, described in Attachment B. As a result, there is probable cause to search NARANJO and HOMAN's person, further described in Attachment A, for Target Device-1 and Target Device-2, described in Attachment B, and to further search Target Device-1 and Target Device-2, described in Attachment B, for evidence of the SUBJECT OFFENSES.

### PROBABLE CAUSE

6. The FBI is investigating allegations of misconduct and corruption by current and former correctional staff employed by the State of Wisconsin Department of Corrections

("DOC") – a state agency that receives federal funds in excess of $10,000 in a one-year period – who used their official positions to provide contraband, to include cellular telephones and controlled substances, to inmates at Waupun Correction Institution ("WCI") – a maximum security penitentiary located in the Eastern District of Wisconsin – in exchange for money.

*WCI Placed on Modified Movement and Seizure of Contraband*

7. According to information provided by WCI's Warden ("INDIVIDUAL-1"), over a period of several months during the end of 2022 and the beginning of 2023, a concerning trend was identified at WCI, which involved increasing displays of defiance, disorder, blatant disobedience, and disrespect for WCI correctional staff. As a result, on March 29, 2023, to protect the safety of the public, the staff, the population, and to preserve order, WCI was placed in a status of modified movement. The modified movement status involved all members of the population being confined to their cells except for medical or other emergencies, as well as a temporary halt to all institution operations other than those that were determined to be essential. The modified movement status, with incremental adjustments having been made, remains in effect today. Inmates have not been allowed to receive visitors at WCI since March 29, 2023.

8. According to information provided by INDIVIDUAL-1, after WCI was placed in a modified movement status and to eventually establish a more ordinary manner of operation, WCI conducted an institution wide search, which included a search of every cell and each area of the institution where the population may have had access. The searches yielded a large volume of seizures, which included contraband that WCI considered serious. The contraband included cellular telephones, improvised weapons, and illicit drugs, which were seized by WCI correctional staff. The seizures led to inmates being placed in Temporary Lock-Up and conduct reports being issued.

3

9.     According to information provided by INDIVIDUAL-1, as a result of the institution-wide search and the seizure of serious contraband, several inmates came forward to offer information in exchange for consideration of a lesser sentence. The inmates who have provided information have described an on-going, wide-scaled, organized operation to traffic contraband into and throughout WCI, which included both individual actors and several networks of people acting in concert with one another.

10.     A preliminary review of information developed by INDIVIDUAL-1 and WCI's former Deputy Warden ("INDIVIDUAL-2") indicates that an established, organized enterprise has been operating at WCI for the purpose of generating revenue by making various types of contraband available to members of the population at WCI. This activity involves members of the population, current WCI correctional staff members, and former WCI correctional staff members.

11.     A general description of the enterprise is as follows: inmates identify a staff member and propose that the staff member smuggle in contraband in exchange for money. The inmate(s) then arrange(s) for someone on the outside to provide the staff member with the contraband (to include cellular telephones and/or controlled substances), and the staff member smuggles that contraband into WCI. The staff member then receives payment, often through Cash App, which is a mobile payment service.

12.     With respect to current WCI correctional staff member involvement, information developed by INDIVIDUAL-1 and INDIVIDUAL-2 through the review of video surveillance, the review of recorded and monitored inmate phone calls, and inmate interviews suggests there may be as many as fifteen current correctional staff directly involved in the trafficking of contraband items into and/or within WCI. This number includes both WCI correctional staff and

4

correctional staff from other DOC institutions who have worked at WCI as part of a supplemental staffing plan.

13. With respect to former WCI correctional staff member involvement, information developed by INDIVIDUAL-1 and INDIVIDUAL-2 through the review of video surveillance, the review of recorded and monitored inmate phone calls, and inmate interviews suggests there are former DOC/WCI correctional staff members who are in contact with one another related to the trafficking of contraband into the institution. According to INDIVIDUAL-1 and INDIVIDUAL-2, this trafficking of contraband by WCI staff has been ongoing since at least fall of 2022.

14. As previously discussed, the institution wide search of WCI resulted in seizures of contraband, to include cellular telephones. According to INDIVIDUAL-2, as of July 13, 2023, WCI correctional staff have located and seized 71 cellular telephones at WCI in 2023.

15. Between July 13, 2023 and August 28, 2023, INDIVIDUAL-2 voluntarily provided the FBI with 43 contraband cellular telephones and one SIM card from a cellular telephone that WCI correctional staff located and seized from inmates, inmate cells, or areas of the institution where the inmate population had access.

16. On October 31, 2023, INDIVIDUAL-1 voluntarily provided the FBI with one additional contraband cellular telephone that WCI correctional staff located and seized from an inmate on October 19, 2023, which is directly related to contraband provided to the inmate by HOMAN, as further described below.

*Search Protocol of Contraband Cellular Telephones*

17. The facility Inmate Rules and Handbook, which each inmate entering WCI receives and signs an Acknowledgement of Receipt (DOC-1310), provides that inmates are not

to have "anything on [their] person, in [their] cell, or otherwise under [their] control that is not approved," and that any items that are "not authorized will be considered contraband and confiscated." Inmate Handbook, Housing Unit Rules, subsection J, p. 13.

18.     Additionally, the Wisconsin Administrative Code, Chapter DOC 303 ("DOC 303"), promulgated by the Wisconsin legislature requires that the DOC "shall provide inmates with a copy of [DOC 303] when they enter the prison system." DOC 303.08. DOC 303 also provides that possession of a cellular phone by an inmate is a "Contraband Offense." DOC 303.48.

19.     Chapter DOC 306 of the Wisconsin Administrative Code provides that "[a] staff member may conduct a search of any area on the premises of a correctional institution," and "the living quarters of any inmate at any time." DOC 306.14 and DOC 306.16.

20.     Further, the United States Supreme Court has held that "society is not prepared to recognize as legitimate any subjective expectation of privacy that a prisoner might have in his prison cell and that, accordingly, the Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell. The recognition of privacy rights for prisoners in their individual cells simply cannot be reconciled with the concept of incarceration and the needs and objectives of penal institutions." *Hudson v. Palmer*, 468 U.S. 517, 526 (1984).

21.     Lastly, the Seventh Circuit has held that an inmate serving a sentence at a halfway house, a less restrictive environment than the maximum-security facility at issue here, did not have a reasonable expectation of privacy to a cellular phone and its contents. *U.S. v. Huart*, 735 F.3d 972, 976 (7th Cir. 2013).

22.     Thus, WCI staff are authorized to search any place in the facility, including inmate cells, and seize and search contraband items such as contraband cellular phones.

*Seizure of Phones from, and Statement by, INMATE-A*

23.     According to a conduct report provided by INDIVIDUAL-2, seven of the cellular telephones voluntarily provided to the FBI were seized from a single inmate's cell ("INMATE-A") on May 18, 2023, at approximately 1:30pm CST. An additional cellular telephone ("Contraband Device-1"), also voluntarily provided to the FBI, was seized from INMATE-A's cell on May 25, 2023, when WCI correctional staff were packing and inventorying all INMATE-A's property in preparation for a transfer of INMATE-A to another DOC institution. INMATE-A provided WCI correctional staff with the passcode for Contraband Device-1. Pursuant to the search protocol outlined above, the contents of Contraband Device-1 were subsequently extracted by FBI digital forensic personnel and a forensic download was made available for review.

*24.*     After the aforementioned cellular telephones were seized from INMATE-A's cell, INDIVIDUAL-2 interviewed INMATE-A. INMATE-A agreed to speak with INDIVIDUAL-2 in exchange for being transferred from WCI to another DOC facility of INMATE-A's choosing. According to court records, INMATE-A is currently in custody for armed robbery, 1st-degree recklessly endangering safety, and felon in possession of a firearm. INMATE-A was convicted on March 12, 2014, and sentenced to 12 years imprisonment and 5 years extended supervision. According to INMATE-A, WCI Corrections Officer LUZ NARANJO was paid to deliver contraband to WCI inmates, to include INMATE-A. INMATE-A told INDIVIDUAL-2 that NARANJO provided him with the eight cellular telephones that were seized from INMATE-A's cell on May 18, 2023 and May 25, 2023. INMATE-A further stated that NARANJO smuggled

both cellular telephones and drugs into WCI for WCI inmates, to include INMATE-A, in exchange for money. INMATE-A claimed that for each delivery of contraband, NARANJO received $2,500.

*WCI Officer LUZ NARANJO*

25.     According to information provided by INDIVIDUAL-1, NARANJO was hired as a Corrections Officer for WCI on or about March 1, 2020. On May 25, 2023, NARANJO was placed on Administrative Leave pending the outcome of an investigation into alleged misconduct[1]. According to information provided by INDIVIDUAL-1, the contact telephone number listed in NARANJO's DOC personnel file is 920-763-2157, which is the telephone number assigned to Target Device-1.

26.     According to information received by subpoena from U.S. Cellular, Target Device-1, a Google Pixel phone, has been subscribed to NARANJO since April 27, 2016. NARANJO is listed as the financially liable party with a billing address of N7253 Forest Road, Lot 20, Beaver Dam, WI 53916.

*The Naranjo Facebook Account*

27.     A review of the forensic download of Contraband Device-1, the contraband phone seized during processing of INMATE-A on May 25, 2023, revealed INMATE-A used Contraband Device-1 to communicate with NARANJO via Facebook Messenger, an instant messaging service owned and operated by Meta. A review of the contacts contained on

---

[1] The letter provided to WCI staff when they are placed on Administrative Leave does not specify the alleged misconduct; however, based on information provided by INDIVIDUAL-1 and INDIVIDUAL-2, NARANJO's alleged misconduct here is related to, in part, conduct described by INMATE-A.

Contraband Device-1 revealed INMATE-A had Facebook ID 100004459448988, username "lucynaranjo," saved in the contacts as "Lucy Naranjo."

28. According to information received by subpoena from Meta Platforms, Facebook ID 100004459448988 is registered to email address "luznaranjo487@gmail.com," and subscribed to a "Lucy Naranjo" (the "Naranjo Facebook Account"). The Naranjo Facebook Account listed multiple telephone numbers as being associated with the account, but the most recently verified telephone number, verified by Facebook on November 13, 2017, was the number associated with Target Device-1. Additionally, a PayPal account was associated with the Naranjo Facebook Account with an email of "luz.naranjo@wisconsin.gov," which was NARANJO's DOC email address.

29. Between April 11, 2023, and April 21, 2023, which was prior to NARANJO being placed on administrative leave, according to information contained on Contraband Device-1, INMATE-A had at least eight missed Facebook Messenger video calls from the Naranjo Facebook Account.

30. According to information received from Meta Platforms pursuant to a search warrant, one of the mobile devices listed for the Naranjo Facebook Account is a Google Pixel, the same device as Target Device-1. Furthermore, a review of the Naranjo Facebook Account's IP activity revealed NARANJO, at times, used a Google Pixel, believed to be Target Device-1, to login to the Naranjo Facebook Account.

31. Also, according to information received from Meta Platforms pursuant to a search warrant, between March 28, 2023 and May 31, 2023, NARANJO searched for INMATE-A's

Facebook username using the Naranjo Facebook Account at least nine times. Additionally, at some point in time[2], NARANJO blocked INMATE-A on Facebook.

*May 6, 2023, Delivery of Contraband Controlled Substances to INMATE-A*

32.     A review of the text messages contained on Contraband Device-1 revealed INMATE-A communicated with several individuals regarding contraband entering WCI, to include cellular telephones and controlled substances. As further illustrated below, there is probable cause to believe these items entered WCI with NARANJO's assistance in violation of the SUBJECT OFFENSES.

33.     The following contains excerpts of text messages exchanged between INMATE-A and an individual I believe to be another WCI inmate ("INMATE-B") based on the content of the text messages they exchanged, between May 4, 2023 and May 6, 2023:

> May 4, 2023 (between 3:52pm and 6:50pm CST)
> INMATE-B: "What's the earliest a muthafucka can meet Walmart… And where cuz nem at… Noon"
> INMATE-A: "Watin on her to text back… 4145512027 lil cuz"
>
> May 5, 2023 (between 5:42am and 5:52am CST)
> INMATE-B: "Bro"
> INMATE-A: "920-763-2157" (Previously identified herein as Target Device-1)
>
> May 6, 2023 (between 6:44am and 7:03am CST)
> INMATE-B: "Did wife send that info"
> INMATE-A: "Yup good looking"
> INMATE-B: "Wife Said it can be double sealed… What did fam conclude, that shit need to be double sealed or a muthafucka slid?... That shit probably loud is fuck"[3]
> INMATE-A: "For now we go double seal that shit frfr… That shit do be too"
> INMATE-B: "I never knew it smelled. So family waited and gone double seal for us, or what? How that's finna go? Muthafucka already gotta sneak at home."
> INMATE-A: "We go double seal it before we give it to her"[4]

---

[2] Meta Platforms did not provide dates regarding blocked activity.

[3] Based on my training and experience as previously described herein, I believe that INMATE-B is describing the quality of contraband controlled substances, specifically, marijuana.

34. Based on my training and experience as previously described herein, as well as my knowledge of the overall investigation, I believe that this conversation shows INMATE-A and INMATE-B discussing a planned delivery of contraband controlled substances to be trafficked into WCI using the assistance of outside persons and WCI staff to include NARANJO based on the inclusion of Target Device-1 in INMATE A and INMATE B's text conversation.

35. On May 6, 2023, at approximately 9:24am CST, a little over two hours after the conversation between INMATE A and INMATE B detailed above, surveillance footage from inside WCI provided by INDIVIDUAL-2 shows NARANJO is observed approaching cell G-26, which at the time housed INMATE-A. NARANJO is seen pushing a cart containing various supplies. NARANJO is observed to be conversing with INMATE-A while rummaging through a crate on the pushcart. Between 9:24am CST and 9:26am CST, NARANJO is observed handing INMATE-A three different items. At approximately 9:26am CST, after NARANJO is observed departing cell G-26 and approaching cell G-25, which is adjacent to cell G-26, NARANJO is observed handing INMATE-A one more item. After NARANJO is observed departing cell G-26, INMATE-A is observed hanging a blanket and two t-shirts from the cell door, obstructing the view of anyone attempting to look into INMATE-A's cell.

36. The following contains excerpts of text messages between May 4, 2023 and May 6, 2023, exchanged between INMATE-A and telephone number 414-551-2027, who INMATE-A referred to as "lil cuz" in a text conversation with INMATE-B on May 4, 2023, as indicated above, and was saved in Contraband Device-1's contacts as "Vell":

---

[4] Based on my training and experience as previously described herein, I believe that INMATE-A is advising INMATE-B that the contraband controlled substances will need two layers of sealing in order to avoid detection when it is brought into WCI.

<u>May 4, 2023 (at 5:33pm CST)</u>
Vell: (Sent two pictures of cellular telephones, one observed as a black TCL cellular telephone[5], see below)

 

<u>May 5, 2023 (at 2:33pm CST)</u>
Vell: "Call me cuz"

<u>May 6, 2023 (at 9:31am CST)[6]</u>
INMATE-A: (Sent video of vacuumed sealed bags containing what appear to be controlled substances, see still images below)

 

37.     The following contains excerpts of text messages exchanged between INMATE-A and an individual I believe to be a former DOC inmate ("INDIVIDUAL-3") based on open

---

[5] One of the seven cellular telephones seized on May 18, 2023, from INMATE-A's cell was identified as a black TCL cellular telephone.

[6] This is approximately five minutes after NARANJO is seen on video handing items to INMATE-A.

12

source research of the telephone number used to communicate with INMATE-A, between May 5, 2023 and May 6, 2023:

> May 5, 2023 (between 2:47pm and 3:00pm CST)
> INMATE-A: "Wats the name of the vacuum sealer u got um about to order me one"
> INDIVIDUAL-3: "It's called a food saver vacuum seal"[7]
>
> May 6, 2023 (between 9:33am and 12:04pm CST)
> INMATE-A: "Tell bro pack touchdown"[8]
> INDIVIDUAL-3: "Ight, whenever he decides to call I got you"
> INMATE-A: "Tell bro make sure he put his phone up tonight the c.o. bitch I got on deck just said they coming over first thing in the morning and pulling kick doors"
> INDIVIDUAL-3: "Good looking…"

38.     Based on my training and experience as previously described herein, I believe that this conversation shows INMATE-A telling INDIVIDUAL-3 that the delivery of contraband controlled substances had been made, that INMATE-A has information that staff will be searching inmate cells the next day, and INDIVIDUAL-3 commenting on the quality of the contraband controlled substances trafficked into WCI on May 6, 2023.

39.     A review of the forensic download of Contraband Device-1 revealed one photograph (see below image) and three videos, dated May 6, 2023, and timestamped between 9:29am CST and 9:46am CST, shortly after NARANJO is seen on video handing items to INMATE-A, of vacuumed sealed bags containing what appear to be controlled substances. The photograph and videos appear to be taken from inside INMATE-A's cell. In one of the videos, the individual making the video, believed to be INMATE-A, is observed displaying the

---

[7] Based on my training and experience as previously described herein, and my knowledge of the overall investigation, I believe this conversation is a discussion regarding a method of packaging contraband controlled substances in an effort to avoid detection when brought into WCI.

[8] This is approximately seven minutes after NARANJO is seen on video handing items to INMATE-A.

vacuumed sealed bags and describes the contents, stating, in part, "this is how ya'll wake up on a Saturday mornings man, fresh packs coming again… that's a boat of rollers… couple zips of powder… edibles right here… tobacco… I'm supplying everybody man…"[9] This particular video is the same video INMATE-A sent to "Vell" on May 6, 2023 at 9:31am, previously detailed above.



*Naranjo's JPMorgan Chase Bank Account*

40.     According to information received by subpoena from JPMorgan Chase Bank, N.A. ("JPMC"), NARANJO has maintained a checking account (the "9649 Account") with JPMC since approximately January 2010. NARANJO is the sole signatory on the account. Additionally, between August 25, 2020, and May 7, 2023, a time period during which NARANJO worked at WCI, NARANJO deposited $25,531 in cash into the 9649 Account. On May 7, 2023, the day after NARANJO is observed delivering what is believed to be contraband controlled substances to INMATE-A, NARANJO deposited $3,000 into the 9649 Account.

---

[9] Based on my training and experience as previously described herein, and my consultation with drug agents, a "boat of rollers" is a slang term for 1,000 pills of Methylenedioxymethamphetamine (MDMA), commonly known as ecstasy; a "zip of powder" is a slang term for an ounce of cocaine; and "edibles" are food products infused with tetrahydrocannabinol, commonly referred to as "THC," the intoxicating chemical compound in marijuana.

41.     Based on my training and experience as previously described herein, and my knowledge of the overall investigation, I believe this cash deposit to be the deposit of the payment for the delivery of contraband controlled substances to INMATE-A on May 6, 2023.

*Additional Contacts Between INMATE-A and NARANJO*

42.     A further review of the forensic download of Contraband Device-1 revealed Target Device-1 also attempted to call INMATE-A at Contraband Device-1 just minutes before the seven cellular telephones were seized from INMATE-A's cell on May 18, 2023, further demonstrating the connection between INMATE-A and NARANJO. On May 18, 2023, at approximately 1:49pm CST, Target Device-1 attempted to call INMATE-A at Contraband Device-1. As discussed previously herein, seven cellular telephones were seized from INMATE-A's cell on May 18, 2023 at approximately 1:30pm CST.

*WCI Facilities Repair Worker WILLIAM HOMAN*

43.     According to information provided by INDIVIDUAL-2, HOMAN smuggled "all sorts of contraband" into WCI for several inmates, to include an inmate located in cell H-30 of the South Cell Hall ("INMATE-C"). INDIVIDUAL-2 became aware that HOMAN was being paid to bring contraband into WCI for inmates, to include INMATE-C, via Cash App, which is an electronic payment platform. INDIVIDUAL-2 provided law enforcement with screenshots of Cash App transactions that were sent via mail by INMATE-D's father and addressed to INMATE-D, and which contained screenshots of Cash App transactions between INMATE-C's father and HOMAN.

44.     According to information provided by INDIVIDUAL-1, HOMAN was hired as a Facilities Repair Worker for WCI on or about December 9, 2019. On October 18, 2023, HOMAN was placed on Administrative Leave pending the outcome of an investigation into

alleged misconduct[10]. According to information provided by INDIVIDUAL-1, the contact telephone number listed in HOMAN's DOC personnel file is 920-296-5040, which is the telephone number assigned to Target Device-2.

45.　According to information received by subpoena from U.S. Cellular, Target Device-2, a Samsung Galaxy phone, has been subscribed to by HOMAN's spouse, Kimberly Homan, since July 26, 2001. HOMAN is listed as an authorized user on the account. HOMAN's spouse is listed as the financially liable party with a billing address of 214 S. Depot St., Fox Lake, WI 53933.

*October 18, 2023, Search of HOMAN*

46.　On October 18, 2023, according to DOC incident reports provided by INDIVIDUAL-1, after WCI received information that HOMAN could be introducing contraband to inmates residing in the South Cell Hall, WCI staff observed live video surveillance of HOMAN's activities. At approximately 2:18pm CST, HOMAN was observed stopping in front of cell H-30[11] or H-31. HOMAN was observed speaking to the inmate in cell H-30 or H-31. HOMAN was then observed using his DOC-issued radio to call for a cell door to be opened. When the cell door did not open, HOMAN was observed walking down the stairs. WCI staff confronted HOMAN and informed HOMAN that he needed to leave the cell hall and proceed with them to the Security Director's Office. After arriving at the Security Director's Office, HOMAN was asked by WCI staff if he had anything on his person that he should not have.

---

[10] As previously indicated, the letter provided to WCI staff when they are placed on Administrative Leave does not specify the alleged misconduct; however, based on information provided by INDIVIDUAL-1, HOMAN's alleged misconduct here is related to, in part, conduct described by INDIVIDUAL-2 and which is further described herein.

[11] As previously stated in this Affidavit, cell H-30 housed INMATE-C.

HOMAN informed WCI staff that he had cigarettes and chewing tobacco on his person, items that are considered contraband within the confines of WCI. HOMAN emptied the pockets of his pants and produced two packs of unsealed cigarettes and a clear Ziplock-type bag containing 74 chewing tobacco pouches. Shortly thereafter, INDIVIDUAL-1 arrived at the Security Director's Office and informed HOMAN that he was being placed on Administrative Leave pending the outcome of an investigation into alleged misconduct.

*Seizure of Phone from INMATE-C*

47.     According to a conduct report provided by INDIVIDUAL-1, the cellular telephone ("Contraband Device-2") voluntarily provided to the FBI on October 31, 2023, was seized from INMATE-C's cell on October 19, 2023. Pursuant to the search protocol outlined above, the contents of Contraband Device-2 were subsequently extracted by FBI digital forensic personnel and a forensic download was made available for review.

48.     A review of the electronic communications contained on Contraband Device-2 revealed INMATE-C communicated directly with HOMAN at Target Device-2 using WhatsApp[12] regarding contraband entering WCI, to include controlled substances, and the methods used to provide the contraband to inmates. As further illustrated below, there is probable cause to believe these items entered WCI with HOMAN's assistance.

49.     The following contains excerpts of WhatsApp messages exchanged between INMATE-C and Target Device-2, between August 29, 2023 and October 18, 2023:

   <u>August 29, 2023 to September 2, 2023</u>

---

[12] WhatsApp is an end-to-end encrypted instant messaging and voice-over-IP service. The service requires a cellular telephone number to sign up. A review of the contents of Contraband Device-2 revealed the telephone number used to communicate with INMATE-C via WhatsApp was Target Device-2.

HOMAN: "Sup"
INMATE-C: "Smart move I should have done this before but it needs internet to run so I can't use it during the day I just sent you some messages so check those out delete them and anything hot we can say on here"[13]
HOMAN: "See what's up wiff ol man[14] if you would please haven't got nuttn from him"[16]
INMATE-C: "I got his 200 in my app so I've got 500 for you right now you got that 7[15] right?"[16]
HOMAN: "Yup"
INMATE-C: "If you need that cash for your trip say the word bro and I'll send it off… Are you gone yet or are u coming in today?"
HOMAN: "Yes pwease leaving at lunch today I got a z[17] and 2 tab[18] for you today"
INMATE-C: "Alright bud I'll let her know in the a.m. you have it by like 10 am when u coming back"
HOMAN: "Tuesday"

September 8, 2023
INMATE-C: "Yo what's the word"

---

[13] Based on my training and experience as previously described herein, I believe that INMATE-C is telling HOMAN to communicate via WhatsApp regarding bringing contraband into WCI for INMATE-C, and others, and to delete any messages INMATE-C and HOMAN exchanged via text message.

[14] Based on information provided by INDIVIDUAL-2, "ol man" and "old man" was the nickname within WCI for an inmate who is later identified and referred to as INMATE-D.

[15] As detailed later herein, records obtained from Cash App show that HOMAN received a payment of $700 with the subject "for [INMATE-C]" from an associate of INMATE-C's, later identified and referred to as INDIVIDUAL-6, on August 30, 2023.

[16] Based on my training and experience as previously described herein, and my knowledge of the overall investigation, I believe HOMAN is asking INMATE-C to collect payment from another inmate and that INMATE-C is confirming he has done so.

[17] Based on my training and experience as previously described herein, and my consultation with drug agents, a "z" is shorthand for a "zip," which is a slang term for an ounce of a controlled substance.

[18] Based on my training and experience as previously described herein, and my consultation with drug agents, a "tab" is a slang term for Hydrocodone tablets, which is a narcotic used to treat severe, chronic pain.

HOMAN: "My siss  got a phone call and heard that I got walked out last Friday for phones and drugs said its all over waupun no idea where it came from… I ain't heard shit from no one"
INMATE-C: "Me either but that's goofy as hell didn't some shit like that happen before because of westhouse or some shit"
HOMAN: "Yup"
INMATE-C: "And you've been at work all week right?"
HOMAN: "I was gone Monday Tuesday and siss called me Tuesday night… I gots everything ready how bout early next week if I don't hear anything"
INMATE-C: "You'll be fine I'm sure ,someone just didn't see u for a few days and make some type off comment and that's how shit gets started but ya if you wanna wait till next week I can live with that. Same as always plus the zip right"
HOMAN: "Yup"
INMATE-C: "Alright well let me know what's up and showers usually Monday so shoot for Tuesday if you can. Until then just be smooth"

September 11, 2023 to September 13, 2023
INMATE-C: "Hey let me know what's up if it today or tomorrow. Or what. U might be able to pull it off early today if they do showers on second but wither way I've got a couple zips in Milwaukee and like I said I'll still give you the same 750 and you just have to pick it up from my chick she's on an ankle bracelet so she can't meet you but she's like 40 minutes from u well talk more and I really wanna revisit this laundry thing but we will have to schedule that shit like when u go there bring the bag with just a zip in it and say something about a wheel on a cart . My guy will be theonly one he would talk to about that and he'll bring ya right to him. Trust me one time would ya. See ya soon"[19]
HOMAN: "Tomorrow  be better got escort this am"
INMATE-C: "Ight… After count?"
HOMAN: "I nervous still hearing shit on outside about me about cellphone s even over at dodge thay talking about me"
INMATE-C: "I wish you'd have said that before I sent you another 1100 dollars[20] lol. My guy if you where under investigation for real thy would have sent you home and shit not always but most of the time. And I usually hear about c.os and staff getting walked out

_____

[19] Based on my training and experience as previously described herein, and my knowledge of the overall investigation, I believe HOMAN and INMATE-C are planning the delivery of and payment for contraband controlled substances.

[20] As previously indicated at footnote 15, records obtained from Cash App show that HOMAN received a payment of $700 from INDIVIDUAL-6, on August 30, 2023. As detailed later herein, records obtained from Cash App show that HOMAN received a payment of $400 from INDIVIDUAL-6, on September 3, 2023. Based on my training and experience as previously described herein, and my knowledge of the overall investigation, I believe INMATE-C is referring to the August 30, 2023 and September 3, 2023 transactions for $700 and $400, respectively, which totals $1,100.

19

before it happens because people are rumor mills here and I haven't heard mum. Idk man I guess let me know but I'm a pretty good read on this stuff and I think your good just make sure you do a work order on another range after u do it up here so it doesn't look like your just coming here

HOMAN: "Yah ill prolly do it tommorow just don't want any trouble"

INMATE-C: "I get it man and I'd rather be smart and I know this rumor shit popped up on us outa nowhere but I had a chance to buy some shit from the other side but couldn't swing the cheese cause I Sent it your way .I'm not fucked up about it your my guy and I'd rather you. Had yours and I wait a week vs anything else. Hit Lil tonys if possible. He knows what's good. Also let me know one time this weekend when I can call you once so we can talk talk"

September 15, 2023 to September 19, 2023

INMATE-C: "What's up man I'm gonna rethink my shit here so it makes it easier on you so why don't we just do a zip every time a pack of marlboro reds and the chew for the same g and like I said I've got my guy in Delavan who's got a few zips so u ain't gotta buy that shit no more but he just has to meet sometime on the weekend… Less shit for u and hopefully we can run this think a little smoother if you don't have all that sit to bring… Of course all that applies after this run"[21]

HOMAN: "Ok got escort till 2ish supposedly ill try after that"

INMATE-C: "It's all good man but we've ran into a reoccurring theme here ,I send you a bunch of cash up front and for 3 to 4 weeks I'm here with my dick in my hand lol. I get that it's not in your control sometimes but I know for certain you've been over this way since you've been back. I know u got w.e Goin on with whoever but when shit was open you said these dudes do a g a week well,if you can bring me 2 zips a week I'll do 2 g's a week up front as always but I can't be over here with nothing but hopes and dreams for 3 to 4 weeks after I spend over a g with you . What ever you got going on otherwise has nothing to do with me so I expect it to not interfere with what we've got going on . If you say there are rumors about you I know Fer sure it wasn't me that made you hot so again I don't expect that to really interfere with me. What I'm basically saying is I'll spend what ever ,I've been fuxking with you for years and spent tens of thousands of dollars with you and always been understanding about having to wait but as of late it seems like I'm waiting longer and longer and I've done nothing but give you a better profit margin everytime we talk about doing something new . I literally pay 5 times more that Gordy for the tab and chew and that fine but I expect it to be at the very least ran to me or one of my 6 guys I got on deck within a couple Weeks at the latest. I always take care of you bro try to take care of me sometime my guy"[22]

---

[21] Based on my training and experience as previously described herein, and my knowledge of the overall investigation, I believe INMATE-C is suggesting that HOMAN traffic an ounce of controlled substances, cigarettes and other tobacco products in exchange for $1,000 on a week-to-week basis.

[22] Based on my training and experience as previously described herein, and my knowledge of the overall investigation, I believe INMATE-C is complaining to HOMAN that INMATE-C is

HOMAN: "Done wiff escorts today for the week I hope. ill be by tommorow to lill guys spot and I'll swing by and talk to juss been nervous front door Sargent passick even heard about it so hope you understand"

INMATE-C: "Ya man don't get me wrong I get it but you have ran me shit like 4 times in 6 Months bro.. there's no way that makes you hot. That's what I'm trying to say .I'm careful, I'm smart ,I always come correct with the cash, and I DONT MAKE YOU HOT lol. These other dudes do not care about you my guy. Like I said do what you do but it the 3 grand I can send you a month isn't enough to supplement your income idk what is . I mean your cost out of the 3 grand I'd send is what? 600 maybe so that's 2400 in your pocket and you do that for a year bro.. that's 28 gs a year to the good. Anything more than that to me your just being reckless and hungry for cash ya know. I get it,you fuck with other people but if they keep putting you in a sketchy position than they don't deserve for you fuck with them. Cause it ain't me my guy. So you need to either check your people for doing weird shit or cut off the dead weight and fuck with me exclusively. But either way u don't need them fucking shit up we got going on because they don't know how to move and it comes down to me waiting extra 2 to 3 weeks because of those idiots because they put you on the radar. So like I said I understand you might have been on the radar but I want you to realize one day that I may be on to something when I say that it's not you doing it,it's them and it messes with what we've got going on . I'll see you soon and just think about what I said"[23]

September 22, 2023 to September 29, 2023
HOMAN: "Sup… Wassup everything go ok"
INMATE-C: "Yep all good same thing plus I got the last 200 I owe old man coming too"
HOMAN: "I only got 4 so far"
INMATE-C: (sent screenshots of two Cash App transactions, see images below)

---

paying HOMAN for contraband tobacco and controlled substances up front and HOMAN is not making delivery for several weeks. This conversation also indicates that INMATE-C is paying $1,000 per ounce of controlled substances, and that INMATE-C has paid HOMAN "tens of thousands" of dollars over a multi-year period.

[23] Based on my training and experience as previously described herein, and my knowledge of the overall investigation, I believe INMATE-C is discussing the history INMATE-C and HOMAN have in trafficking contraband into WCI, HOMAN also trafficking contraband for other inmates, as well as they payment and profit HOMAN receives in exchange for trafficking contraband for INMATE -C.



HOMAN: "Thought that was for last one mb"

INMATE-C: "Nope it's all good I sent it saying ill send ya the other 4 wen u came through but then you said you would appreciate the cheese for your fishing trip and I said np an sent the Rest… That's why I was itchy it was three weeks plus a day or two since I'd sent that cash"

HOMAN: "Ok where we at now k uzz I broke as fuk"

INMATE-C: "Lol I got you my guy ill send 500 in the a.m and I'll be plus 500 for me I still owe 2 for Ole man and I'll owe another 500 for the next drop I'll shoo ya another 500 by the end of the week… So that's 1200 you'll get this week and you'll be behind one drop same as the last… I'm gonna try to send another 500 today if I can so I'll have her send a g at once if she didn't do that other one already"[24]

INMATE-C: "You get that first 5[25]"

HOMAN: "Yup"

INMATE-C: "Yo gonna send u another 500 today count on you next week ?"

HOMAN: "Yup what kind of cigs ?"

INMATE-C: "Can I catch a pack of Newport and pack of marb reds and I'll throw and extra 50 on the Newport are for the nigs"

---

[24] Based on my training and experience as previously described herein, and my knowledge of the overall investigation, I believe INMATE-C is telling HOMAN that INMATE-C will pay HOMAN $500 the following day and $500 by the end of the week in advance of the next delivery of contraband.

[25] As detailed later herein, records obtained from Cash App show that HOMAN received a payment of $500 from INDIVIDUAL-6, on September 25, 2023.

INMATE-C: "I just told her to send that you should get it in the a.m. btw that shit on the other side is super messy .mf got popped over there so just use your head and think about what I said . And from my source said. Don't trust mud"[26]

October 2, 2023
INMATE-C: "Yo so clarification ,one I wanna check and make sure got that other 5 imma send the two today for old man. List goes as follows… Zip… 2 packs squares… 5 chew… Ole man's shit 1and 1 I believe… Let me know if we're ready to go"
HOMAN: "Waiting on z shld be tonight… I got 5"[27]

October 5, 2023 to October 15, 2023
INMATE-C: "Yo what's the splan stan"
HOMAN: "Be by Tommorow"
INMATE-C: "After lunch ??... Evidently not"
HOMAN: "Sorry dude took off today my dads is in hospital ill be back on monday"
INMATE-C: "You haven't hit me back in a week man what's up?"
HOMAN: "Ill be back tomorrow been gone all week"

October 18, 2023
INMATE-C: "What's the word man"
HOMAN: "Ill try again today 1 z 2 packs 5 pchs"
INMATE-C: "Yesir… You gonna have old man's stuff too or you waiting on that I forgot I gotta send 2 for him I'll do it today"

*September 20, 2023, WCI Surveillance Footage*

50.     On September 20, 2023, at approximately 1:27pm CST, according to surveillance footage from inside WCI provided by INDIVIDUAL-1, HOMAN is observed speaking to an inmate ("INMATE-D") outside cell H-39 on the H-Range. At approximately 1:29pm CST, the cell door for cell H-39 is opened and INMATE-D exits the cell. HOMAN is observed entering the cell and is inside cell H-39 for approximately two minutes. At approximately 1:32pm CST,

---

[26] Based on my training and experience as previously described herein, and my knowledge of the overall investigation, I believe INMATE-C is telling HOMAN that INMATE-C will have a female associate send a payment of $1,000 to HOMAN.

[27] Based on my training and experience as previously described herein, and my knowledge of the overall investigation, I believe INMATE-C and HOMAN are confirming the details of the next delivery of contraband to include an ounce of controlled substances, cigarettes and tobacco.

HOMAN is observed entering another inmate's cell ("INMATE-E"), located a couple cells down the hall from INMATE-C on the H-Range. While HOMAN is in INMATE-E's cell, INMATE-E is observed walking up and down the cell hall speaking to inmates in other cells on the H-Range. Approximately 10 minutes later, at approximately 1:42pm, HOMAN is observed exiting INMATE-E's cell. At approximately the same time, INMATE-E is observed taking possession of a blue and white in color box from INMATE-D's cell and re-entering his cell. Over the next several minutes, HOMAN is observed speaking to inmates in various cells along the H-Range while INMATE-E is observed walking in and out of his cell and handing items to other inmates through their cell doors. At approximately 1:44pm CST, HOMAN is observed stopping at INMATE-D's cell again and speaking to INMATE-D through his cell door for approximately two minutes.

51.    As previously discussed, on September 22, 2023, approximately two days after HOMAN is observed entering and exiting inmate cells on the H-Range, and INMATE-E is observed handing items to other inmates through their cell doors after HOMAN is observed inside INMATE-E's cell for approximately 10 minutes, HOMAN, using Target Device-2, sent a WhatsApp message to INMATE-C, using Contraband Device-2, stating, "Sup… Wassup everything go ok."

52.    Based on my training and experience as previously described herein, and my knowledge of the overall investigation, I believe the September 20, 2023 surveillance footage shows HOMAN delivering contraband to INMATE-D's cell, which is then retrieved by and distributed to other inmates on H-Range by INMATE-E, with delivery confirmation made to INMATE-C via WhatsApp.

*Recorded WCI Jail Calls*

24

53.     The Wisconsin Administrative Code, Chapter DOC 309 ("DOC 309") states that "[d]uring assessment and evaluation an inmate shall be given a notice written in English and Spanish which informs the inmate of the monitoring and recording of any calls." DOC 309.39(8). Further, "[a] written notice in English and Spanish shall be posted on the telephone or near enough to the telephone used by an inmate that the inmate will be able to read the notice when the inmate used the telephone," which "inform[s] the inmate that a call other than a property approved call to an attorney shall be monitored and recorded and that the use of the telephone constitutes consent to the monitoring and recording." DOC 309.39(9).

54.     DOC 309 also states: "A corrections officer or supervisor may do all of the following: (a) Monitor and record an inmate's phone call. … (c) Disclose the contents of a recording of an inmate's telephone conversation to any of the following: … 6. An investigative officer. 7. A law enforcement officer. … (d) Use the contents of a recording of an inmate's telephone conversation for any of the following reasons: … 4. For investigations of threats to the security of the correctional facility. 5. For investigation of threats to the safety, health or welfare of employees, the public, and other inmates. … 7. For investigation of trafficking of drugs or other contraband. 8. For investigations of any illegal activity." DOC 309.39(6).

55.     The Waupun Correctional Institution Rules & Information Handbook, which each inmate entering WCI receives and signs an Acknowledgement of Receipt (DOC-1310), provides

> "All inmate personal telephone calls, other than properly placed attorney calls, may be monitored and recorded. Monitoring and recording consists of:
> - Interception of the inmate's call by a person(s) designated by the Warden and consistent with DOC 309.
> - The listening to recorded conversations by a person(s) designated by the Warden and consistent with DOC 309.
> - Information that will be recorded from telephone calls will be the DOC number, inmate name, date, time, destination

25

number, and duration of the call and the telephone conversation.

Waupun Correctional Institution Rules & Information Handbook, p. 25.

56. For all inmate phone calls at WCI there is an automated advising that "all calls other then properly placed attorney's phone calls may be monitored and recorded." This message is played at the beginning of the phone call and then again about halfway through the phone call.

57. According to recordings of inmate jail telephone calls that are retained by WCI in its normal course of business as detailed above, several inmates discussed having associates that were not in custody facilitate payments to HOMAN on their behalf.

58. On September 19, 2022, a WCI inmate ("INMATE-F"), who WCI staff suspected of receiving contraband from HOMAN, participated in a recorded jail telephone call with his spouse ("INDIVIDUAL-4"). The following contains excerpts of the recorded jail telephone call:

> INMATE-F: "I need you, I need you… To… send that to my guy…"
> INDIVIDUAL-4: "Okay."
> INMATE-F: "What we talked about."
> INDIVIDUAL-4: "Yeah, I know."
> INMATE-F: "You remember?"
> INDIVIDUAL-4: "This morning? The email I got?"
> INMATE-F: "No I'm talking about what we talked about."
> INDIVIDUAL-4: "Oh I already forgot…. How much?"
> INMATE-F: "3…"
> INDIVIDUAL-4: "Alright."[28]

59. Based on my training and experience as previously described herein, and my knowledge of the overall investigation, I believe this recorded phone conversation shows INMATE-F instructing INDIVIDUAL-4 to pay $300 to HOMAN in exchange for contraband brought into WCI by HOMAN.

---

[28] As detailed later herein, records obtained from CashApp show that HOMAN received a payment of $300 with the subject "pick up" from INDIVIDUAL-4 on September 19, 2023.

26

60.     On May 24, 2023, a WCI inmate ("INMATE-G"), who WCI staff suspected of receiving contraband from HOMAN, participated in a recorded jail telephone call with his niece ("INDIVIDUAL-5"). The following contains excerpts of the recorded jail telephone call:

> INMATE-G: "Go on Cash App right now. I'm going to have you send this out… okay… so… dollar sign."
> INDIVIDUAL-5: "It's on there."
> INMATE-G: "D, U, K"
> INDIVIDUAL-5: "Hold on. What are you having me do?"
> INMATE-G: "I'm having you send money."
> INDIVIDUAL-5: "Well, you need me to, you need me to… tell me how much?"
> INMATE-G: "$300."
> INDIVIDUAL-5: "$300… k… to who?"
> INMATE-G: "Uh, dollar sign."
> INDIVIDUAL-5: "Dollar sign, yep."
> INMATE-G: "D, U, K."
> INDIVIDUAL-5: "D, U, K."
> INMATE-G: "E, S, T, O, R, M, 77."
> INDIVIDUAL-5: "Willy Homan, okay."
> INMATE-G: "Put on there, put on there… from old man."[29]
> INDIVIDUAL-5: "From old man… you sent $300 to Willy Homan, done."[30]

61.     Based on my training and experience as previously described herein, and my knowledge of the overall investigation, I believe this recorded phone conversation shows INMATE-G instructing INDIVIDUAL-5 to pay $300 via CashApp to HOMAN in exchange for contraband brought into WCI by HOMAN.

62.     On August 16, 2023, INMATE-C, who communicated with HOMAN at Target Device-2 and received contraband from HOMAN, as previously discussed, participated in a

---

[29] Based on my training and experience as previously described herein, and my knowledge of the overall investigation, I believe "old man" is the same "old man" as previously identified and referred to as INMATE-D and who is referred to by INMATE-C in INMATE-C's WhatsApp conversations with HOMAN recovered from Contraband Device-2 as detailed previously herein.

[30] As detailed later herein, records obtained from CashApp show HOMAN utilizes the alias "dukestorm77," and that on May 24, 2023, HOMAN received a payment of $300 with the subject "from old man" from someone with the same last name as INDIVIDUAL-5.

recorded jail telephone call with an individual I believe to be a girlfriend of INMATE-C ("INDIVIDUAL-6") based on the content of their recorded jail telephone calls. The following contains excerpts of the recorded jail telephone call:

> INDIVIDUAL-6: "Oh, you need me to send that still?"
> INMATE-C: "You said what?"
> INDIVIDUAL-6: "You need me to send that still?"
> INMATE-C: "The 4?"
> INDIVIDUAL-6: "Yeah."
> INMATE-C: "Yeah, if you would."
> INDIVIDUAL-6: "I don't remember which one it was again."
> INMATE-C: "uh… shit… uh… 77."
> INDIVIDUAL-6: "Really?"
> INMATE-C: "Uh, [laughs] I'm trying not to [inaudible] sorry… uhhh… D S 77… does that help?"
> INDIVIDUAL-6: "Yeah."[31]

63. Based on my training and experience as previously described herein, and my knowledge of the overall investigation, I believe this recorded phone conversation shows INMATE-C instructing INDIVIDUAL-6 to pay $400 via CashApp to HOMAN in exchange for contraband brought into WCI by HOMAN.

*Target Device-2 Toll Records Analysis*

64. Between October 6, 2022 and February 10, 2023, according to information received by subpoena from U.S. Cellular, Target Device-2 exchanged 182 text messages and two telephone calls with INDIVIDUAL-4.

65. Between May 12, 2023 and June 1, 2023, according to information received by subpoena from U.S. Cellular, Target Device-2 exchanged 4 text messages and 1 telephone call with INDIVIDUAL-6.

---

[31] As detailed later herein, records obtained from CashApp show that on August 16, 2023, HOMAN received a payment of $400 from someone with the same first name (no last name displayed) as INDIVIDUAL-6.

66. Between June 30, 2023 and August 29, 2023, according to information received by subpoena from U.S. Cellular, Target Device-2 exchanged 63 text messages with Contraband Device-2. Of note, the last text message between Target Device-2 and Contraband Device-2 was an outgoing text message from Target Device-2 on August 29, 2023, at approximately 3:04pm CST, just hours before Target Device-2 and Contraband Device-2 began exchanging electronic communications via WhatsApp, as previously detailed herein.

*Homan's Cash App Account*

67. According to information received by subpoena from Block, Inc. ("Cash App"), HOMAN opened a Cash App account (the "Homan Cash App Account") with Cash App on or about June 30, 2022. HOMAN's Cash Tag, which is a unique identifier for individuals using Cash App akin to a username, was dukestorm77. HOMAN also listed Target Device-2 as the telephone number associated with the Homan Cash App Account.

68. Between July 14, 2022 and September 30, 2023, according to information received by subpoena from Block, Inc., which corresponded to a time period during which HOMAN worked at WCI, the Homan Cash App Account received approximately $53,500 from Cash App accounts either connected directly to WCI inmates or to associates of WCI inmates. A review of the individual transactions wherein the Homan Cash App Account received monies from Cash App accounts connected directly to WCI inmates or to associates of WCI inmates showed that, at times, the transactions corresponded to recorded telephone conversations inmates had with associates, as previously discussed above, as well as WhatsApp communications HOMAN had with INMATE-C, as previously discussed above. For example:

    a. On September 19, 2022, following the recorded jail telephone call INMATE-F had INDIVIDUAL-4, as noted in Paragraph 58, the Homan Cash App

Account received $300 from a Cash App account in the name of INDIVIDUAL-4. The subject line of the transaction stated, "pick up."

b. On May 24, 2023, following the recorded jail telephone call INMATE-G had with INDIVIDUAL-5, as noted in Paragraph 60, the Homan Cash App Account received $300 from a Cash App account in the name of INDIVIDUAL-5's husband. The subject line of the transaction stated, "from old man."

c. August 16, 2023, following the recorded jail telephone call INMATE-C had with INDIVIDUAL-6, as noted in Paragraph 62, the Homan Cash App Account received $400 from a Cash App account in the name of INDIVIDUAL-6. The subject line of the transaction stated, "for kivi."

69. Based on a review of all the subject lines associated with transactions between the Homan Cash App Account and Cash App accounts connected directly to WCI inmates or to associates of WCI inmates, there is probable cause to believe the monies the Homan Cash App Account received were payments for HOMAN's assistance in providing contraband, to include cellular telephones and controlled substances, to WCI inmates. For example:

a. On July 26, 2022, the Homan Cash App Account received $60.00 from a Cash App account in the name of INDIVIDUAL-4 with the subject line, "Gummies."

b. On August 11, 2022, the Homan Cash App Account received $100.00 from a Cash App account in the name of INDIVIDUAL-4 with the subject line, "phones will be bought Friday."

c. Between August 12, 2022 and August 19, 2022, the Homan Cash App Account received $1,700 from a Cash App account in the name of INDIVIDUAL-4 with the subject line, "the rest of money."

30

70.     In my training and experience, people frequently keep their cellular telephones on or very near their person at nearly all times of the day. It is common practice for most people to rely heavily on the use of their cellular telephone for many aspects of their daily lives.

71.     There is also reason to believe that NARANJO and HOMAN frequently use Target Device-1 and Target Device-2, described in Attachment B. For example, on January 23, 2024, according to information being received by court order from U.S. Cellular, Target Device-1 had approximately 20 incoming/outgoing calls and text messages, consistently throughout the day, between 6:33am CST and 10:30pm CST. Similarly, on January 24, 2024, according to information being received by court order from U.S. Cellular, Target Device-2 had approximately 41 incoming/outgoing calls and text messages, consistently throughout the day, between 7:50am CST and 11:32pm CST.

*Reason to Believe Target Device-1 and Target Device-2 Contain*

*Evidence and Instrumentalities of the SUBJECT OFFENSES*

72.     Further, there is probable cause to believe that records of NARANJO and HOMAN's commission of the SUBJECT OFFENSES will be found on Target Device-1 and Target Device-2, described in Attachment B.

73.     As previously indicated in this Affidavit, there is probable cause to believe NARANJO and HOMAN used Target Device-1 and Target Device-2, respectively, to communicate with WCI inmates, to include INMATE-A and INMATE-C, on days relevant to the SUBJECT OFFENSES. Indeed, on May 18, 2023, Target Device-1 attempted to call INMATE-A at Contraband Device-1 just minutes before the seven cellular telephones were seized from

31

INMATE-A's cell. Similarly, on October 18, 2023, the day HOMAN was confronted and found to have contraband in the form of cigarettes and chewing tobacco on his person, Target Device-2 communicated with INMATE-C about delivering cigarettes and chewing tobacco, amongst other items, to INMATE-C.

74.     Also, as previously indicated in this Affidavit, HOMAN communicated with INMATE-C, both via text message and via WhatsApp, as well as associates of INMATE-C and INMATE-F, using Target Device-2, hundreds of times between October 6, 2022 and October 18, 2023, while HOMAN was employed by WCI.

75.     On February 12, 2024, FBI surveillance identified HOMAN at 214 S. Depot St., Fox Lake, WI 53933.  On February 22, 2024, FBI surveillance identified NARANJO at N7253 Forest Road, Lot 20, Beaver Dam, WI 53916.  Based on the investigation to date, I believe those locations to be their residences.  Beaver Dam and Fox Lake are both located in the Eastern District of Wisconsin.

## **TECHNICAL TERMS**

76.     Based on my training and experience, I use the following technical terms to convey the following meanings:

    a.     Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.

These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b.      Digital camera:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images.  Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.  Removable storage media include various types of flash memory cards or miniature hard drives.  Most digital cameras also include a screen for viewing the stored images.  This storage media can contain any digital data, including data unrelated to photographs or videos.

c.      Portable media player:  A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files.  However, a portable media player can also store other digital data.  Some portable media players can use removable storage media.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can also store any digital data.  Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

77.     Based on my training, experience, and research, and from consulting the manufacturer's advertisements and product technical specifications available online, I believe that Target Device-1 and Target Device-2 have capabilities that allow each to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

**ELECTRONIC STORAGE AND FORENSIC ANALYSIS**

78.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

79.     *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how Target Device-1 and Target Device-2 were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence might be on Target Device-1 and Target Device-2 because:

a.      Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b.      Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

80. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the subject devices consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the devices to human inspection in order to determine whether that part constitutes evidence described by the warrant.

81. *Manner of execution.* Because this warrant seeks permission to forensically examine devices that will, after their seizure, be in law enforcement's possession, I submit there

is reasonable cause for the Court to authorize that the forensic examination portion of the warrant at any time in the day or night.

82. I know from my training and experience, as well as publicly available materials, that encryption systems for mobile phones and other electronic devices are becoming ever more widespread. Such encryption systems protect the contents of these devices from unauthorized access by users and render these contents unreadable to anyone who does not have the device's password. As device encryption becomes more commonplace, the encryption systems implemented by device manufacturers are becoming more robust, with few—if any— workarounds available to law enforcement investigators.

83. I also know that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners, facial recognition features, and iris recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize. Therefore, I request that this warrant permit law enforcement agents to obtain from NARANJO and HOMAN the compelled display of any physical biometric characteristics (such as fingerprint/thumbprint or facial characteristics) necessary to unlock any device(s) requiring such biometric access subject to seizure pursuant to this warrant for which law enforcement has reasonable suspicion that NARANJO and HOMAN's physical biometric characteristics will unlock.

84. If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once

a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

85. If a device is equipped with a facial-recognition feature, a user may enable the ability to unlock the device through his or her face. For example, this feature is available on certain Android devices and is called "Trusted Face." During the Trusted Face registration process, the user holds the device in front of his or her face. The device's front-facing camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the frontfacing camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers (such as Apple's "Face ID") have different names but operate similarly to Trusted Face.

86. If a device is equipped with an iris-recognition feature, a user may enable the ability to unlock the device with his or her irises. For example, on certain Microsoft devices, this feature is called "Windows Hello." During the Windows Hello registration, a user registers his or her irises by holding the device in front of his or her face. The device then directs an infrared light toward the user's face and activates an infrared-sensitive camera to record data based on patterns within the user's irises. The device can then be unlocked if the infrared-sensitive camera detects the registered irises. Iris-recognition features found on devices produced by other manufacturers have different names but operate similarly to Windows Hello.

87. In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to

38

unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

88.　As discussed in this Affidavit, your Affiant has reason to believe that Target Device-1 and Target Device-2 are subject to search and seizure pursuant to the applied-for warrant. The passcode or password that would unlock Target Device-1 and Target Device-2 are currently not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within Target Device-1 and Target Device-2, making the use of biometric features necessary to the execution of the search authorized by this warrant.

89.　I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period. For example, certain Apple devices cannot be unlocked using Touch ID when: (1) more than 48 hours has elapsed since the device was last unlocked; or, (2) when the device has not been unlocked using a fingerprint for 8 hours and the passcode or password has not been entered in the last 6 days. Similarly, certain Android devices cannot be unlocked with Trusted Face if the device has remained inactive for four hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time. Due to the foregoing, if law enforcement personnel encounter any device(s) that are subject to seizure pursuant to this warrant and may be unlocked using one of

the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to obtain from NARANJO and HOMAN the display of any physical biometric characteristics (such as fingerprint/thumbprint or facial characteristics) necessary to unlock any device(s), including to (1) press or swipe the fingers (including thumbs) of the aforementioned person to the fingerprint scanner of the device(s); (2) hold the device(s) in front of the face of the aforementioned person to activate the facial recognition feature; and/or (3) hold the device(s) in front of the face of the aforementioned person to activate the iris recognition feature, for the purpose of attempting to unlock the device(s) in order to search the contents as authorized by this warrant.

**CONCLUSION**

90.     I submit that this affidavit supports probable cause for a warrant to search NARANJO and HOMAN's person, further described in Attachment A, for Target Device-1 and Target Device-2, described in Attachments A and B, and to further search Target Device-1 and Target Device-2 for evidence of the SUBJECT OFFENSES.

## ATTACHMENT A

*Persons to be searched*

The person of Luz Maria NARANJO, born 11/18/1979, for the phone assigned cellular telephone call number (920) 763-2157 ("Target Device-1"), with service provided by U.S. Cellular and subscribed to by NARANJO.



The person of William Lee HOMAN, born 05/06/1977, for the phone assigned cellular telephone call number (920) 296-5040 ("Target Device-2"), with service provided by U.S. Cellular and subscribed to by HOMAN's spouse, Kimberly Homan.



*Devices to be searched*

Target Device-1.
Target Device-2.

*Evidence to be seized*

1.      All records and information on Target Device-1 and Target Device-2, described in Attachment A, that relate to violations of 18 U.S.C. § 666 (Federal Program Bribery), 18 U.S.C. § 1951(a) (Conspiracy to Obtain Property Under Color of Official Right), 18 U.S.C. §§ 1343 & 1346 (Honest Services Wire Fraud), 18 U.S.C. § 1951(a) (Obtaining Property Under Color of Official Right), 18 U.S.C. § 1952(a)(3) (The Travel Act), 21 U.S.C. § 841 (Distribution of a Controlled Substance and Possession of a Controlled Substance with Intent to Distribute), 21 U.S.C. § 843(b) (Use of a Communication Facility to Facilitate a Drug Felony), and 21 U.S.C. § 846 (Conspiracy to Distribute a Controlled Substance) and involve Luz Maria NARANJO and William Lee HOMAN since January 1, 2020, including:

(a)      All records, information, and communications relating to the logistics of smuggling in contraband to Waupun Correctional Institution ("WCI"), to include how any controlled substance was smuggled into WCI;

(b)      Records, information, and communications with current and former WCI inmates;

(c)      The finances—including but not limited to expenditures, obligations, income, and any financial or monetary transfers—of Luz Naranjo and William Homan;

(d)      Records, information, and communications relating to the sale and possession of controlled substances;

(e)      All bank records, checks, credit card bills, account information, and other financial records for any payments related to the sale, possession, or transportation of controlled substances;

(f)     Records and information relating to the identity or location of the suspects, associates, and co-conspirators;

2.     Evidence of user attribution showing who used or owned Target Device-1 and Target Device-2 at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

During the execution of the search of the person described in Attachment A, law enforcement personnel are authorized to obtain from Luz Maria NARANJO and William Lee HOMAN the compelled display of any physical biometric characteristics (such as fingerprint/thumbprint, facial characteristics, or iris display) necessary to unlock Target Device-1 and Target Device-2 requiring such biometric access subject to seizure pursuant to this warrant for which law enforcement has reasonable suspicion that the aforementioned person's physical biometric characteristics will unlock Target Device-1 and Target Device-2, to include pressing fingers or thumbs against and/or putting a face before the sensor, or any other security feature requiring biometric recognition, for the purpose of attempting to unlock Target Device-1 and Target Device-2's security features in order to search the contents as authorized by this warrant.

With respect to the search of the information provided pursuant to this warrant, law enforcement personnel will make reasonable efforts to use methods and procedures that will locate and expose those categories of files, documents, communications, or other electronically stored information that are identified with particularity in the warrant while minimizing the

review of information not within the list of items to be seized as set forth herein, to the extent reasonably practicable. If the government identifies any seized communications that may implicate the attorney-client privilege, law enforcement personnel will discontinue its review and take appropriate steps to segregate all potentially privileged information so as to protect it from substantive review. The investigative team will take no further steps regarding any review of information so segregated absent further order of the court. The investigative team may continue to review any information not segregated as potentially privileged.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.